## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

**JOHN A. TARPOFF**

 **Plaintiff,**

**v.**

**UNITED STATES OF AMERICA,**

 **Defendant.**       **Case No. 09-cv-411-DRH-PMF**


### MEMORANDUM & ORDER

**HERNDON, Chief Judge:**

### I.  INTRODUCTION

Pending before the Court is plaintiff's motion to award fees and costs (Docs. 55, 83). Plaintiff seeks an award of attorney's fees and costs incurred in the instant litigation and underlying administrative proceedings, as he argues the government was not substantially justified in its position that he was a person responsible for the quarterly tax periods ended March 31, 2004 and June 30, 2004, who willfully failed to collect the withheld income, social security, and Medicare taxes or to truthfully account for or pay over those taxes to the IRS. *See* 26 U.S.C. § 6672.  The government naturally opposes plaintiff's motion (Doc. 84). For the following reasons, the Court **GRANTS in part** plaintiff's request.

## II.    **BACKGROUND**

Plaintiff was the head cattle buyer at Gateway Beef, LLC, (Gateway Beef), a slaughterhouse and beef-packaging facility. Gateway Beef was formed in September 2003 by the Gateway Beef Cooperative, an organization of farmers and ranchers, together with Brach's Glatt Meat Markets, a grocery store in New York owned by Sam Brach (Brach).[1]  The Cooperative invested in, and sold cattle to, Gateway Beef, which then produced kosher beef for Brach's Glatt Meat Markets.

The instant dispute arises from Gateway Beef's failure to pay its withholding taxes. On November 26, 2007, pursuant to 26 U.S.C. § 6672(a), the IRS levied a total penalty of $66,693.02 against plaintiff, alleging his status as a "responsible person" who "willfully" failed to collect, account for, or pay over payroll taxes to the United States. *See* 26 U.S. § 6672(a).  Plaintiff contested this assessment at the administrative level to no avail.  Therefore, plaintiff filed suit against the government on May 29, 2009, pursuant to 26 U.S.C. § 6672, seeking recovery of monies the IRS withheld from one of his tax refunds, as well as money he paid under protest.  The government counterclaimed for the remainder.

Following a three-day jury trial held from March 14-16, 2011, the jury returned a verdict in favor of plaintiff, finding he was not a person responsible for collecting or accounting for the withheld taxes and that he did not act willfully (Doc. 48).  On April 14, 2011, the government filed a motion for judgment as a matter of law and, alternatively, a motion for new trial (Doc. 64).  Therefore, the government requested that the Court hold plaintiff's instant motion in abeyance

---

[1] Plaintiff notes Sam Brach passed away in early 2007 (Doc. 55-5, p. 1).

pending the Court's ruling on the government's alternative requests (Doc. 56). The Court granted the government's request. Meanwhile, plaintiff motioned to supplement the instant motion on May 17, 2011 (Doc. 70).

In an Order dated February 15, 2012, the Court denied the government's alternative requests for judgment as a matter of law or a new trial, and granted plaintiff's request to supplement the instant motion (Doc. 73).[2] The Court further extended the government's deadline to respond to the instant motion from 14 days after entry of its Order, to the customary time allowed for responses to post-trial motions following plaintiff's filing of his supplement; 30 days. Thus, the government's response to the instant motion was due thirty days following plaintiff's filing of his supplement. *See* SDIL-LR 7.1(g). Plaintiff filed his supplement on February 17, 2012 (Doc. 73). Accordingly, the government's response was due, at the latest, by March 21, 2012. *See* SDIL-LR 5.1(c) (allowing an additional three days to the prescribed response time when filing an electronic response).

On March 21, 2012, the government motioned for a date certain to respond, as it cited confusion concerning the requisite date (Doc. 74). On March 29, 2012, the Court granted plaintiff's motion to enter judgment (Doc. 55), but deferred ruling on plaintiff's instant motion for an award of fees and costs, as the government requested a date certain to respond, and plaintiff's motion did not provide the Court with the information necessary of an informed decision. Thus,

---

[2] The government appealed this Court's denial of its motion for judgment as a matter of law, the denial of its motion for new trial, and the judgment entered in plaintiff's favor, on March 30, 2012 (Doc. 78). On June 14, 2012, the government voluntarily dismissed its appeal (Doc. 85).

the Court ordered plaintiff to file a supplemented motion by April 11, 2012, and set the government's response date as April 25, 2012. Plaintiff timely filed his supplemented motion (Doc. 83), and the government timely responded (Doc. 84). Accordingly, plaintiff's motion is ripe for resolution.

Plaintiff alleges 26 U.S.C. § 7430 entitles him to an award of attorney's fees and costs incurred in the underlying administrative process and in litigating his claims before this Court. In support, plaintiff states he is a "prevailing party," as he "substantially prevailed" with respect to the issues presented and because both the government's administrative and litigation positions were not "substantially justified." Thus, plaintiff seeks fees in the amount of $51,526.67. However, as this amount reflects fees above the statutory cap, plaintiff alternatively seeks $23,756.97, should the Court find "special factors" do not exist.

### III.   Legal Standards

#### A. 26 U.S.C. § 7430

Plaintiff alleges 26 U.S.C. § 7430, a provision of the Internal Revenue Code, entitles him to the disputed award of fees and costs.  Section 7430 is the exclusive means through which a "prevailing party" can recover an award of fees and costs, "[i]n any administrative or court proceeding which is brought by or against the United States in connection with the determination, collection, or refund of any tax, interest, or penalty under this title."  26 U.S.C. § 7430(a).  Thus, it is undisputed that Section 7430 is instantly applicable.

### a. Threshold Requirements of Section 7430

The purpose of Section 7430 is to deter abusive IRS conduct and enable taxpayers to vindicate their rights regardless of their economic circumstances. *See Morrison v. Comm'r*, 565 F.3d 658, 661 (9th Cir. 2009). Thus, Section 7430 authorizes an award of attorney's fees and costs to the "prevailing party" in any administrative or court proceeding concerning a tax dispute, provided several conditions are satisfied. *See Wilfong v. United States*, 991 F.2d 359, 364 (7th Cir. 1993). Further, this award may include both, "(1) reasonable administrative costs incurred in connection with such administrative proceeding within the Internal Revenue Service, and (2) reasonable litigation costs incurred in connection with such court proceeding." 26 U.S.C. § 7430(a).

However, a "prevailing party" may recover administrative and litigation costs only if they exhaust all administrative remedies available to them, do not unreasonably protract the proceeding, prevail in the litigation, and demonstrate that their costs are reasonable. 26 U.S.C. § 7430(b); *Zinniel v. Comm'r*, 883 F.2d 1350, 1356 (7th Cir. 1989). Moreover, as threshold inquiries, a party must submit its application for fees and costs within thirty days of final judgment and attest that his or her net worth did not exceed $2,000,000.00 when the action was filed.[3] *See* 26 U.S.C. § 7430(c)(4)(A)(ii) (incorporating requirements of 28 U.S.C. § 2412(d)(2)(B)). Instantly, the parties dispute whether plaintiff qualifies as a

---

[3] On February 17, 2012, plaintiff submitted sufficient documentation demonstrating his net worth is less than $2,000,000.00. (*See* Doc. 73) (filed under seal).

"prevailing party," as defined under Section 7430, and whether the amount of fees and costs plaintiff seeks is reasonable.

### b.  "Prevailing Party"

Section 7430 defines "prevailing party" as any party which substantially prevailed with respect to the amount in controversy or the most significant issues presented.  *See* 26 U.S.C. § 7430(c)(4)(A)(i).  However, under the current version of Section 7430(c)(4)(B)(i), a party who seemingly prevailed against the United States is not deemed a prevailing party, "if the United States establishes that the position of the United States in the proceeding was substantially justified."  Thus, the government bears the burden of demonstrating its "position" was "substantially justified."  *See Barford v. Comm'r*, 194 F.3d 782, 786 n. 4 (7th Cir. 1999) (discussing 1996 amendments to Section 7430).

### c.  "Position of the United States"

Importantly, Section 7430(c)(7) defines "position of the United States," as:

(A) the position taken by the United States in a judicial
     proceeding to which subsection (a) applies, and

(B) the position taken in an administrative proceeding to which
     (a) applies as of the earlier of –

a.  the date of the receipt by the taxpayer of the notice of the
     decision of the Internal Revenue Service Office of Appeals,
     or

b.  the date of the notice of deficiency.

Plaintiff seeks fees and costs incurred prior to the instant judicial proceedings.  Thus, based on the plain language of the statute and case law

interpreting it, two distinct stages of the government's position require evaluation: the government's position from the date plaintiff received notice from the IRS Office of Appeals of its decision, November 1, 2007, and the period following the government's filing of its answer, August 10, 2009. *See Huffman v. Comm'r*, 978 F.2d 1139, 1143 (9th Cir. 1992) (discussing 1988 amendments to Section 7430 which delineated the administrative and court phases of proceedings); *Grant v. Comm'r*, 103 F.3d 948, 952 (11th Cir. 1996); *Jean v. United States*, 396 F.3d 449, 455 (1st Cir. 2005); *Pac. Fisheries Inc. v. United States*, 484 F.3d 1103, 1109-10 (9th Cir. 2007); *Bale Chevrolet Co. v. United States*, 620 F.3d 868, 872 (8th Cir. 2010).[4]

### d.  "Substantially Justified"

"Substantial justification" means "justified in substance or in the main-that is, justified to a degree that could satisfy a reasonable person." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotations and citations omitted) (applying the EAJA).[5]   In other words, the government's position must have had a reasonable basis in both law and fact.  *See id.*; *Barford v. Comm'r*, 194 F.3d 782, 786 (7th Cir. 1999); *Wilfong*, 991 F.2d at 364. However, it is well-settled that a

---

[4] The Court notes the Seventh Circuit has not yet directly addressed whether Section 7430 requires a bifurcated analysis as to the government's administrative and litigation positions, except to comment that the 1988 amendments to Section 7430 allow for consideration of the government's administrative and litigation position.  *See Zinniel v. Comm'r*, 883 F.2d 1350, 1356 (7th Cir. 1989).

[5] Although the Court has determined the specific provisions of Section 7430 instantly apply, Congress copied the "substantially justified" standard in Section 7430 from the Equal Access to Justice Act (EAJA) provisions. Thus, where the wording is consistent, courts have read the EAJA and Section 7430 in harmony.  *Kenagy v. United States*, 942 F.2d 459, 464 (8th Cir. 1991); *In re Arthur Andersen & Co.*, 832 F.2d 1057, 1060 (8th Cir. 1987); *United States v. Balanced Fin. Mgmt., Inc.*, 769 F.2d 1440, 1451 n. 12 (10th Cir. 1985).

party's position can be substantially justified yet incorrect, provided a reasonable person could think the position was correct. *Pierce*, 487 U.S. at 566 n. 2; *United States v. Hallmark*, 200 F.3d 1076, 1079-80 (7th Cir. 2000) (applying the EAJA). Accordingly, the government must demonstrate its position was grounded in: (1) a reasonable basis in truth for the facts alleged; (2) a reasonable basis in law for the theory propounded; and (3) a reasonable connection between the facts alleged and the theory propounded. *Hallmark*, 200 F.3d at 1081; *Phil Smidt & Sons, Inc. v. NLRB*, 810 F.2d 638, 642 (7th Cir. 1987) (applying the EAJA).

Thus, the Court must now determine whether the government's "positions" at both the administrative and trial level were "substantially justified," and if not, whether the Court should award plaintiff the amount of attorney's fees and costs he requests, as it exceeds the presumptive statutory hourly rates. *See* 26 U.S.C. § 7430(c)(1)(B)(iii).

### B. 26 U.S.C. § 6672

As the applicability of 26 U.S.C. § 7430 turns on the reasonableness of the government's position that plaintiff was "responsible" and acted "willfully" as to Gateway Beef's withholding tax liabilities, it is necessary to recite briefly the requisite legal elements of the underlying litigation. 26 U.S.C. § 6672(a) provides that,

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a

> penalty equal to the total amount to be tax evaded, or not collected, or not accounted for and paid over.

26 U.S.C. § 6672(a).

Thus, the jury must have found plaintiff both "responsible" *and* "willful" to uphold the government's assessment of 100 percent liability for the penalty against plaintiff. *Bowlen v. United States,* 956 F.2d 723, 727 (7th Cir. 1992). Further, a tax penalty is presumed valid; thus, plaintiff bore "the burden of proving his lack of responsibility and/or willfulness for the given tax quarters." *Kim v. United States*, 111 F.3d 1351, 1357 (7th Cir. 1997).

An individual is "responsible" if "he retains sufficient control of corporate finances that he can allocate corporate funds to pay the corporation's other debts in preference to the corporation's withholding tax obligations." *Jefferson v. United States*, 546 F.3d 477, 481 (7th Cir. 2008) (citing *Bowlen v. United States*, 956 F.2d 723, 728 (7th Cir. 1992) (internal citation omitted)). Importantly, a person need not have "exclusive control over the disbursal of funds or have the final word as to which creditors should be paid so long as he has significant control," as "the key to liability under Section 6672 is the power to control the decision-making process by which the employer corporation allocates funds to other creditors in preference to its withholding tax obligations." *Id.* "Indicia of 'responsible person' status include: holding corporate office, owning stock in the company, serving on the board of directors, possessing authority to sign checks, and control over corporate financial affairs." *Kim,* 111 F.3d at 1362- 63. However, the Seventh Circuit has held that "merely because a corporate

officer has check-signing responsibilities and his corporation is in financial trouble, it does not follow that he can be held liable for any and all failures to pay withholding taxes." *Jefferson*, 546 F.3d at 480-81 (citing *Wright v. United States*, 809 F.2d 425, 428 (7th Cir. 1987)).

Further, the Seventh Circuit defines "willful" under Section 6672 as encompassing "voluntary, conscious and intentional- as opposed to accidental- decisions not to remit funds properly withheld to the government." *Domanus v. United States¸* 961 F.2d 1323, 1324-25 (7th Cir. 1992).  However, a person's actions are also considered "willful" if he or she "recklessly disregarded a known risk that taxes were not being paid over." *Kim*, 111 F.3d at 1357.

### IV.   <u>Application</u>

#### A. Administrative Position not "Substantially Justified"

As to the government's administrative position, both parties agree that the IRS Appeals Office sent plaintiff notice of its rejection of his challenge to the proposed assessment on November 1, 2007 (Doc. 83-5). Thus, the Court shall evaluate the reasonableness of the IRS's administrative position in light of the facts and law it relied upon as of this date forward.  As to the substance of the IRS's decision on the relevant date, both parties agree that the IRS's position on November 1, 2007, and IRS revenue officer Gloria Hayes' (Hayes) position on May 9, 2007, generally share the same factual and legal basis.

As to the reasonableness of the IRS's administrative position, plaintiff argues Hayes made an unreasonable initial assessment of liability against him,

resulting from a personal grudge; not his status as a person responsible who willfully failed to pay the withheld incomes taxes of Gateway Beef. Plaintiff alleges Hayes unreasonably persisted in her assessment of liability against him, while refusing to investigate the liability of the true responsible parties. Specifically, plaintiff argues Hayes refused to investigate Brach's liability, instead allowing the statute of limitations to foreclose recovery from his estate. Plaintiff cites to a Saturday phone call as the motivation for Hayes' "grudge." Plaintiff relates that on December 16, 2005, Hayes mistakenly left a note taped to the door of plaintiff's neighbor, asking plaintiff to contact her. The next day, a Saturday, plaintiff contacted Hayes at her home. According to plaintiff, this Saturday phone call gave Hayes an "ax to grind, and she took revenge on [plaintiff] by levying a penalty solely against [plaintiff], and no one else."

The government responds that as part of the IRS's administrative investigation it, "(1) subpoenaed and reviewed bank records, including signature cards and canceled checks, (2) conducted interviews of [plaintiff], his brother Craig Tarpoff, and other employees of [Gateway Beef], [and] (3) reviewed corporate documents such as the articles of organization and documents filed with the state of Illinois." Thus, as of November 1, 2007, the government states that it had collected evidence demonstrating plaintiff's position as an, "officer, employee, member, and manager of [Gateway Beef]." Further, the government states that it had collected evidence that plaintiff was a signatory on Gateway Beef's bank accounts, had invested $50,000.00 in Gateway Beef, directed payment

of bills, opened and closed bank accounts, co-signed loans, authorized or signed payroll checks, and transmitted, reviewed or signed payroll checks, all with respect to Gateway Beef. In support, the government cites solely to the IRS field notes regarding its investigation of the disputed liability (*See* Doc. 55-4).

Upon a detailed review of the IRS field notes in question, the Court does not agree with the government's characterization of the evidence upon which Hayes relied in making her initial assessment of liability. The IRS investigatory notes demonstrate that initially a different agent investigated the underlying tax liability; Hayes' investigation began in March 2005. Prior to Hayes' involvement, various persons were contacted in regards to the tax liability. On October 12, 2004, Michelle Weiss (Weiss), described as the "Secretary of the corporation," informed the agent that, "Sam Brock[sic] is the person whom handles the taxes and he is hospitalized." Further, Weiss informed the agent that plaintiff was an "officer" (Doc. 55-4, p. 6).   Relevantly, on March 24, 2005, Weiss called the agent, identifying herself as one of the, "officers of the LLC." The agent noted that Weiss, "request[ed] [the IRS] deal with her because she has all paperwork" (Doc. 55-4, p. 11). Further, the notes generally indicate contemplation of assessment against Brach, as Weiss specifically informed the agent he was responsible for the tax liability (Doc. 55-4, pp. 7-9).

The investigation notably changed course upon Hayes' involvement. Plaintiff alleges this resulted from Hayes' personal grudge against him. While the Court declines to comment as to Hayes' motives, prior to December 2005, Hayes

indicates that she is investigating numerous individuals' responsible status for the liability in question. For instance, she notes the names of plaintiff, Alexander Tarpoff, and Sam Brach, are all present on a bank signature card. Further, in June 2005, she notes William Boston (Boston), a person she refers to as "treasurer," signed returns demonstrating balances due of $35,000.00 and $42,000.00. Hayes indicated her intent to contact Boston to determine his responsibility for the liability (Doc. 55-4, p. 17). However, her notes demonstrate that she never contacted Boston. As to Hayes' interview of Craig Tarpoff, plaintiff's brother, it appears he informed her that his, "brother owned [the] business and leased the building from him" (Doc. 55-4, p. 20).

December 2005, as plaintiff suggests, marks a turn in Hayes' investigation. Hayes' notes from the "Saturday phone call incident" state that plaintiff indicated the "officers" of Gateway Beef as: plaintiff-member, Sam Brach-president, and Bill Boston-treasurer.  Further, Hayes notes that plaintiff "claims no responsibility for the liability." In contradiction, Hayes informed him, "bank statements, signature cards and other information show[][plaintiff] as a responsible officer" (Doc. 55-4, p. 29). On this same date, Hayes again indicates that she will investigate others concerning their responsibility for the liability. However, the remainder of Hayes' notes demonstrates she did not investigate other parties from this date forward.

Following a year of inactivity, on January 29, 2007, Hayes states, "[f]urther review of case indicated for the periods in question sole responsible officer is [plaintiff] as he signed all checks, and has signatory authority, there are no other

parties who signed checks. Additionally, Hayes indicates that although Boston, "as the treasurer" signed returns, his signature did not appear on any checks. Thus, she stated her intent to prepare assessment against plaintiff, as the "sole responsible officer" (Doc. 55-4, p. 38). In this same vein, Hayes concluded on February 7, 2007, "[w]hile there are other members on the signature card and on the signature of the 2941 return [sic] question, [plaintiff] was the only person to write checks for thebusiness[sic] as heis[sic] on the signature card. Thus[,] the proposed assessment is being made against this member solely" (Doc. 55-4, p. 39).

Therefore, on March 12, 2007, Hayes notified plaintiff of the initial assessment of liability against him. Plaintiff retained counsel and filed an objection to Hayes' initial assessment on April 24, 2007 (Doc. 55-5). Generally, plaintiff protested his control over the finances of Gateway Beef. Plaintiff stated Brach, who passed away in early 2007, had total control over the allocation of Gateway Beef's funds during the relevant periods. Plaintiff stated Brach did not share information about the company's assets or liabilities with plaintiff. Further, plaintiff stated he was never a manager of Gateway Beef, nor was he included in meetings where Brach discussed the company's finances with its accountant and attorney, Mark Weiss. Plaintiff further related that while he initially had check-signing authority, Brach instructed the company's bank to remove plaintiff from the company's signature card in June 2004. Brach instructed plaintiff to sign checks only when Brach expressly authorized and directed plaintiff to do so.

Plaintiff attached a letter to his formal protest from Mark Weiss stating that as of June 20, 2004, Brach would be the sole signer on the account (Doc. 55-5, p. 5). The letter further stated that plaintiff was not, nor he had ever been, a manager and implied his general lack of authority as to finances. A letter from Brach attached to plaintiff's protests confirmed Brach's direction that "any checks written on said account and signed by [plaintiff] will not be honored by your bank" (Doc. 55-5, p. 11).

Plaintiff further attached an affidavit of himself, detailing his limited involvement in Gateway Beef's finances. He stated he did not have authority to decide what bills, debts, obligations, or taxes Gateway Beef would pay. He stated he did not know whether Gateway Beef paid its withheld payroll taxes to the government in 2004. However, plaintiff averred that when he asked Brach about the payment of withheld payroll taxes to the government, Brach informed plaintiff he had a "good lawyer" looking into the issue and stated he would handle the payroll taxes (Doc. 55-5, pp. 8-9). Plaintiff also provided Hayes with a letter from Brach dated August 4, 2004, stating, as Brach provided all funding for Gateway Beef, any decision "big or small" concerning the "spending of money" required Brach's prior approval (Doc. 55-5, p. 13). Finally, plaintiff provided Hayes with a letter from Brach dated October 19, 2004, informing Marsha Caughron (Caughron), Gateway Beef's office manager, "if we receive any correspondences or communications regarding payroll liabilities [of Gateway Beef], pass the

correspondence and refer any communications to [Mark Weiss]" (Doc. 55-5, p. 16).

On May 9, 2007, despite plaintiff's protest and the documents he provided, Hayes reiterated her conclusion that plaintiff was "the sole party in control of the bank account and any decisions are reflected in all cancelled checks during his occupancy in the business" (Doc. 55-4, p. 42).   Hayes additionally cites the Saturday telephone conversation she had with plaintiff on December 17, 2005. Hayes stated plaintiff indicated he was "an employee, member and manager of the now defunct LLC."   Further, Hayes stated plaintiff informed her he "invested approximately 50K in the business and he bought and sold cattle for the business. In addition, [plaintiff] further state[d] he directed and authorized payment of bills, opened and closed bank accounts, co-signed loans authorized or signed payroll checks, and transmitted, reviewed and or signed payroll returns" (Doc. 55-4, p. 42).[6]

However, as related above, Hayes' notes from the Saturday phone conversation with plaintiff on December 17, 2005, simply state that plaintiff listed the "known officers" of Gateway Beef as plaintiff- member, Brach- president, and

---

[6] The Court presumes Hayes' findings at least in part reply on corporate authorization resolutions of Gateway Beef (Doc. 84-4). However, the corporate authorizations generally authorize plaintiff, Alexander Tarpoff, and Sam Brach to open accounts, endorse checks, and engage in other limited financial transactions. It is unclear on what basis Hayes' specific statements rely, especially in light of the evidence presented at trial. At trial, plaintiff specifically denied making these comments to Hayes. Regarding the phone conversation to which Hayes refers, plaintiff states he told Hayes that he was merely an employee of Gateway Beef and only had the authority to sign checks. Further, plaintiff stated he gave Hayes Brach's contact information and told her to contact Brach concerning the liability (Doc. 59, Trial Transcript Vol. II, pp. 150, 155-56). This information is notably absent from Hayes' notes. Thus, as Hayes' comments are not supported in either the administrative or judicial record, and are in direct contradiction to plaintiff's repeated and consistent statements in opposition, the Court seriously doubts their sincerity.

Bill Boston (Boston)- treasurer. Importantly, her notes make no mention of the various factors recited above.   Further, the above-cited facts are in direct contradiction to the affidavit and documentary evidence plaintiff provided. In support of her assessment, Hayes cites the following:

     i. Banks[sic] signature card dated September 3, 2003 showing, [plaintiff] having authority on the account with one required signature. [Plaintiff] is the only signature as listed.

     ii. Bank signature card dated September 6, 2003 listing [plaintiff] with 2 other persons and again authorizing one signature requirement.

     iii. Banks[sic] signature card dated September 16, 2003 with [plaintiff] signature as being the only signature on the card.

     iv. Bank signature card dated October 24, 2003 with [plaintiff] having signatory authority and requiring one signature.

     v. [Plaintiff] has signed the signature card under penalty of perjury.

     vi. There is no record from the Bank of Edwardsville, that [plaintiff's] name was removed from the signature card.

(Doc. 55-4, p. 42).   Thus, Hayes states, "[a]ll cancelled checks disclose that beginning January 1, 2004 through June 28, 2004, only [plaintiff] signed checks for [Gateway Beef] thus making decision[sic] on who and what to pay. The liability in question are payroll taxes for the quarter ending March 321[sic], 2004 and June 30, 2004 of which [plaintiff] was in power to operate the business and make financial decisions relating to the business"  (Doc. 55-4, p. 42).

     The government and plaintiff generally agree that Hayes' decision of May 9, 2007, and the IRS's position as of the relevant date, November 1, 2007, are based on the same evidence. However, plaintiff additionally states that upon his appeal

of Hayes' determination on September 6, 2007, he submitted copies of Gateway Beef's articles of organization to IRS settlement officer Randy J. Allen (Doc. 55-7). Plaintiff argues the articles of organization demonstrate that plaintiff was not a manager of Gateway Beef. While plaintiff signed the articles in his capacity as an organizer, the articles state that Gateway Beef is not member-managed. Further, the articles list the managers of Gateway Beef as Gateway Beef Cooperative and Brach's Glatt Meat Markets. Thus, in addition to the evidence Hayes lists as demonstrating plaintiff's status as a responsible person for the tax liability, plaintiff argues the government's position of November 1, 2007, was also determined in contradiction to Gateway Beef's articles of organization.

Upon receiving notice of the denial of plaintiff's appeal, plaintiff made a formal offer in compromise in the amount of $14,217.60 on December 3, 2007. The IRS rejected plaintiff's offer on September 11, 2008, stating, "[w]e are upholding the Trust Fund Recovery Penalty assessment as previously determined by the Area Director" (Doc. 83-7).

Finally, on November 25, 2008, plaintiff filed a Form 843 Claim for Refund and Request for Abatement on each of the quarterly taxes assessed against him. In support, plaintiff attached affidavits from himself and Caughron. Caughron stated that she was the officer manager of Gateway Beef from November 2001 until December 2004.[7] Caughron's affidavit of June 26, 2008, stated that as

---

[7] Caughron initially began her employment with Gateway Beef, Inc, Gateway Beef Cooperative's holding company. She began working for Gateway Beef around June of 2004. The government believes that Caughron's statements are not relevant to the liability in question, as her employment at Gateway Beef did not begin until near the end of the default periods in question. However, the Court finds that Caughron's knowledge as to plaintiff's general inability to control the finances of

officer manager, she handled the day to day office operations at Gateway Beef and reported to Boston and Brach. Generally, Caughron explained that plaintiff was merely an employee of Gateway Beef with no ownership interest in the business. Further, she related that as head cattle buyer for Gateway Beef, plaintiff spent ninety percent of his time traveling. According to Caughron, plaintiff did not have decision making authority regarding what bills Gateway Beef would pay.

Importantly, Caughron related that Brach controlled Gateway Beef's finances and made all decisions regarding what invoices or bills would be paid. In regards to plaintiff's check-signing authority, Caughron related that she would prepare all checks on behalf of Gateway Beef, and would then send those checks with supporting documentation to Brach in New York for his approval; plaintiff only reviewed and signed checks that Brach or Brach's son had previously approved. Thus, Caughron stated that plaintiff "did not have authority to issue payments or sign checks on behalf of [Gateway Beef] without Brach's express authority to make a specific payment or sign a particular check."

As to the tax liability in question, Caughron stated she received notices from the IRS regarding unpaid payroll taxes in her role as officer manager. She notified Brach of the IRS notices and forwarded the notices to Brach at his business address in New York. Further, Brach told Caughron that he had decided that neither Brach nor Gateway Beef would pay the payroll taxes. Finally,

Gateway Beef as of June 2004 is relevant to his general inability to control Gateway Beef's finances prior to June 2004, as plaintiff's affidavit concerning his lack of authority is consistent with Caughron's. Further, evidence presented at trial demonstrated that Kathy Kircher, the previous bookkeeper, had the same duties as Caughron.

Caughron stated plaintiff did not have the authority to decide whether Gateway Beef would pay payroll taxes, he was not a part of Gateway Beef's decision making structure, and he did not sit on Gateway Beef's board of directors (Doc. 83-8. pp. 25-28). The IRS denied plaintiff's Form 843 request on February 3, 2009, forcing plaintiff to file the underlying judicial action in this Court.

In light of the above, the Court finds the government has not met its burden of demonstrating its administrative position was substantially justified. As to Hayes' decision of May 9, 2007, in her own words, she initially assessed sole liability against plaintiff based entirely on his check-signing authority. Thus, Hayes' determination that check-signing authority equated financial control constituted an improper analytical leap, as it was unsupported by the record before her. *See United States v. Bisbee,* 245 F.3d 1001, 1008 (8th Cir. 2001) (IRS's position that a corporate officer was a responsible person solely because of his title and status was not reasonable under § 7430. Officer's ability to cause check to be issued did not equate the authority to do, especially given that the IRS possessed evidence indicating that the officer had no authority to pay taxes).

The government instantly argues that Hayes made her initial assessment due to plaintiff's status as a signatory on Gateway Beef's bank accounts, his investment of $50,000.00 in Gateway Beef, his direct payment of bills, his opening and closing of bank accounts, his co-signature on loans, and his authorization or signature on payroll checks. The Court notes that the government is correct that Hayes cites these general facts in rebuttal to plaintiff's protest. However, Hayes

does not indicate a credible basis on which these statements rely, nor has the government instantly demonstrated such a basis existed, especially in light of the credible evidence plaintiff submitted in protest to Hayes' assessment demonstrating his general inability to control Gateway Beef's finances. *Cf. Jean*, 396 F.3d at 456-57 (upholding district court's denial of fees under § 7430, as on the relevant administrative date and at the onset of litigation the government possessed evidence of plaintiff's authority to disburse funds and it did not possess reliable evidence of plaintiff's lack of authority to decide which creditors to pay). Moreover, Hayes' initial assessment and the government's instant argument fail to point to any evidence of plaintiff's "willfulness" on which the government's administrative position relied.

Thus, while Hayes' interview led to somewhat contradictory information concerning plaintiff's involvement in Gateway Beef, for example, the statements of his brother[8] and various vague references to plaintiff's status as an "officer," it is clear that Hayes based her finding of sole responsibility on plaintiff's status as a signatory on Gateway Beef's bank accounts. Thus, while it is undisputed that plaintiff had check-signing authority, Hayes did not possess evidence concerning plaintiff's authority to control Gateway Beef's finances.  Hayes clearly did not diligently investigate the context of plaintiff's check-signing ability, in light of the

---

[8] To provide context to the comments of plaintiff's brother, evidence presented at trial demonstrated plaintiff's family owned Tarpoff Packing Company which closed in 2001.  Shortly after its closing, plaintiff's family rented out their packing facility to Gateway Beef Cooperative, which then formed Gateway Beef with Brach's Glatt Meat Market in 2003. Thus, plaintiff's brother was referring to a distinct and separate entity from Gateway Beef.

credible evidence plaintiff provided Hayes demonstrating his lack of financial control over Gateway Beef.

Moreover, while the Court concedes that more than one person can be deemed "responsible" under 28 U.S.C. § 6672, *Jefferson*, 546 F.3d at 481, Hayes deemed plaintiff the "sole" person responsible for the tax liability; a finding clearly not consistent with Hayes' investigation and plaintiff's affidavit and letters sent in protest to Hayes' initial assessment. From the beginning of the administrative investigation, it was clearly indicated that Brach was responsible for the tax liability (*See* Doc. 55-4, p. 6) (statement of Michelle Weiss on October 12, 2004, informing the agent that, "Sam Brock[sic] is the person whom handles the taxes and he is hospitalized."). It was further indicated that Boston had considerable control over Gateway Beef's finances. However, the IRS refused to investigate the liability of either Brach or Boston. Thus, while it was obviously more convenient for the IRS to assess sole liability against plaintiff, due to his locality and willingness to communicate, the Court cannot hold that Hayes' initial assessment of sole liability against plaintiff was reasonable, in light of the considerable evidence of his inability to control Gateway Beef's finances.

As to the IRS's position of November 1, 2007, in addition to the evidence indicated above, the government possessed Gateway Beef's articles of organization which clearly demonstrate plaintiff was not a manager of Gateway Beef.  Once Hayes made an assessment of liability against plaintiff, it was his burden to prove that he was not a person responsible and did not meet the willfulness

requirement. *Kim*, 111 F.3d at 1357.   As referenced above, as of November 1, 2007, plaintiff's check-signing authority represented the extent of the government's credible proof demonstrating his status as a "responsible person." Therefore, the government possessed minimal evidence of plaintiff's status as a "responsible person" and no evidence of his "willfulness."

"The Commissioner cannot have a reasonable basis in both fact and law if it does not diligently investigate a case." *Nicholson v. Comm'r,* 60 F.3d 1020, 1029 (3rd Cir. 1995) (quoting *Powers v. Comm'r Internal Revenue,* 100 T.C. 457, 473, 1993 WL 175413 (1993) (quotations omitted)); *see also United States v. Estridge,* 797 F.2d 1454, 1458 (8th Cir. 1986) (affirming award for litigation costs granted where Commissioner did not diligently investigate). Plaintiff submitted credible and relevant evidence in rebuttal of the IRS's initial assessment of liability.  Thus, the government's refusal to investigate the liability of parties who indisputably possessed sufficient control over the finances of Gateway Beef and acted "willfully" in not paying the taxes at issue was not reasonable. Moreover, the IRS's position became even more unreasonable in light of the articles of organization plaintiff provided, in addition to Caughron's credible and relevant affidavit, offering specific, unbiased evidence in contradiction to the government's assessment of liability. Thus, the Court finds the government has not met its burden of demonstrating its administrative position was substantially justified.

**B. Judicial Position not "Substantially Justified"**

As to the government's judicial position, the government answered plaintiff's complaint on August 10, 2009, additionally asserting a counterclaim for the unpaid balance of the disputed liability (Doc. 9). Despite the above referenced evidence, the government maintained its position that plaintiff was liable for the tax liability pursuant to 26 U.S.C. § 6672. Thus, for the reasons set forth above, the Court holds the government was not substantially justified in maintaining its assessment of liability against plaintiff.

Further, in addition to the above cited evidence, as of December 2010, Boston had additionally informed the government that plaintiff was, "only the registered agent and an employee of [Gateway Beef] and that it was not [plaintiff's] responsibility to pay [Gateway Beef's] taxes." Further, Boston informed the government that he was aware that plaintiff "physically signed checks" but that he only did so under Brach's supervision and control, as Brach had "total control of [Gateway Beef] and [Brach] had to control every check that was signed or payment that was made." Finally, Boston stated that he, "told the Government Attorneys that [Brach] was the person responsible for paying [Gateway Beef's] taxes and that he did not understand "why the United States decided to pursue [plaintiff] because it clearly was [Brach's], not [plaintiff's], responsibility to pay [Gateway Beef's] payroll taxes" (Doc. 55-8).[9] Thus, the government continued to pursue the

---

[9] In regards to Boston's sworn affidavit (Doc. 55-8), the government attaches an affidavit of Andrea Kafka, one of the trial attorneys assigned to the underlying dispute. Kafka states she interviewed Boston in December 2010. She further states he "confirmed" the government's "theory and facts" of the case and desired not to testify at trial (Doc. 84-9). Thus, the government disputes the

instant judicial action against plaintiff, despite ample credible evidence of plaintiff's inability to control the finances of Gateway Beef.

Further, as to the specific evidence presented at trial, as the government engaged in limited pre-trial discovery, its trial position substantially mirrored its administrative position, varying in one relevant aspect; the government possessed even more credible evidence of plaintiff's lack of financial control over Gateway Beef. The government instantly cites to numerous trial exhibits and testimony in support of the substantial justification of its trial position. However, the Court finds the government again mischaracterizes the evidence.

Relevantly, plaintiff testified at length as to how he came to be an employee at Gateway Beef. Plaintiff worked at his family-owned meat packing company, Tarpoff Packing Company, until its closing in 2001. Upon its closing, plaintiff rented the facility to Gateway Beef Cooperative, an organization of farmers and ranchers for which Boston served as treasurer. Gateway Beef Cooperative formed an operating company, Gateway Beef, Inc. Plaintiff held the title of vice-president of Gateway Beef, Inc. Gateway Beef Cooperative and Gateway Beef, Inc., maintained the same board of directors. Plaintiff was not a board member, although he did attend board meetings. As a condition to plaintiff's employment with Gateway Beef, Inc., plaintiff stated he would have no responsibilities as to the company's finances, due to his strenuous travel schedule as a cattle buyer.

---

sincerity of Boston's sworn affidavit specifically detailing information he provided the government in December 2010. In considering the statements of both affidavits, the Court finds Boston's specific, detailed recollection of his conversation with the government is more credible and relevant to the instant dispute than the general statements of trial counsel, especially in light of the evidence presented at trial that generally corroborated Boston's statements.

Plaintiff became acquainted with Brach in 2003, as Gateway Beef. Inc., and Gateway Beef Cooperative sold kosher beef to Brach that he would sell in his New York grocery stores. Brach was interested in obtaining more kosher beef for his stores and Gateway Beef Cooperative and Gateway Beef, Inc., were interested in obtaining an outlet for their beef that was not subject to the "big packer pricing." Thus, the board and Brach, without plaintiff's input, determined it would form Gateway Beef, the LLC instantly at issue. Brach provided all the funding for Gateway Beef; thus, every financial decision required his pre-approval.

As to plaintiff's role in Gateway Beef's formation, due to his familiarity with the parties involved and his locality, he signed the articles of organization as "organizer," as he was not to be a member, manager, or officer of Gateway Beef. Further, the parties agreed plaintiff should have check-signing authority again due to his locality and familiarity with the parties involved. Upon Gateway Beef's formation, plaintiff was exclusively an employee of Gateway Beef and was no longer an employee of Gateway Beef, Inc. Plaintiff again stated that as a condition of his employment, he would have no involvement with the finances of Gateway Beef. Thus, plaintiff provided the context through which the Court must evaluate whether the government's trial position was substantially justified.

Regarding plaintiff's responsible person status, the government argues it presented evidence of plaintiff's status as an officer, his ability to hire and fire employees, his investment of $50,000.00, and his general ability to direct the payment of creditors, as evidenced through his check-signing authority.   As to

plaintiff's status as an officer or general decision maker, the government contends that plaintiff "attended meetings of the Board of Directors" and "held himself out" to be "Secretary" of the company, or "Manager or Member" of the company.  As to plaintiff's attendance of board meetings, the government blatantly mischaracterizes plaintiff's testimony. Plaintiff acknowledged that the board of directors authorized the corporate authorization resolutions that authorized his check-signing authority at board meetings.  However, plaintiff specifically denied he ever attended board member or shareholder meetings of Gateway Beef (Doc. 59, Trial Transcript Vol. II, p. 65). Regarding plaintiff's status as an officer, the government's only evidence consisted of corporate authorization resolutions signed by plaintiff which bear the pre-printed titles of "Secretary" or "Member or Designated Manager" next to his name (Doc. 84-4). Plaintiff, Caughron, and Boston (through his affidavit) all stated that plaintiff was merely an employee/agent of Gateway Beef; he was not a member, manager, or officer.

As to plaintiff's ability to hire and fire employees, plaintiff testified that he hired employees at Gateway Beef, Inc. However, upon the formation of Gateway Beef, plaintiff no longer possessed this authority. He could make recommendations as to hiring. However, every hiring decision required Brach's approval. As to firing, plaintiff similarly explained that he would merely carry out Brach's decisions (*See* Doc. 59, Trial Transcript Vol. II, pp. 118, 140-14).

The government also contends plaintiff invested $50,000.00 in Gateway Beef. Plaintiff testified that in May 2004, while attending a cattle sale that plaintiff

frequented weekly, an owner confronted plaintiff and informed him a check plaintiff had signed had bounced. Plaintiff explained that cattle owners require payment within 48 hours. Plaintiff further explained the importance of honesty and trust in the cattle industry. Thus, plaintiff immediately called Brach, as he provided all of the financing for Gateway Beef. As plaintiff was not able to reach Brach, he called numerous other individuals with authority over the finances of Gateway Beef; namely, Boston and Rob Meyer (Meyer), the president of Gateway Beef Cooperative. After speaking with Meyer over multiple phone conversations, Meyer explained it would be impossible to get plaintiff the money that same day, but that he would get plaintiff the money by the following week.

Thus, in order to save plaintiff's personal reputation, he provided the cattle owner with a personal note. Plaintiff personally submitted a form for reimbursement to Brach. However, after Brach's repeated refusal to honor plaintiff's request, plaintiff was forced to refinance his home. Plaintiff testified that he never intended the money as a capital contribution (Doc. 59, Trial Transcript Vol. II, pp. 95-99). Thus, although it was the government's theory that plaintiff made a capital contribution to Gateway Beef, it did not offer evidence of such intent.

Finally, the crux of the government's argument relies on plaintiff's check-signing authority. Plaintiff has never denied his ability to sign checks for Gateway Beef. Moreover, it is undeniable that plaintiff signed over 1,700 checks during his employment at Gateway Beef. However, plaintiff's authority to sign checks must

be viewed in context. *See Jefferson*, 546 F.3d at 480-81. The government relies on plaintiff's signature on the above mentioned checks, his status as a signatory on Gateway Beef's bank accounts, and the corporate authorization resolutions which additionally endowed plaintiff with check-signing authority, as evidencing plaintiff's ability to direct the finances of Gateway Beef. Relevantly, two of the three corporate authorization resolutions authorize plaintiff, plaintiff's father, and Brach to open accounts, endorse checks, withdraw funds, and enter agreements for financial products on behalf of Gateway Beef; one resolution authorizes only plaintiff (Doc. 84-4).

Plaintiff testified at length concerning the context in which he exercised is check-signing authority. He would only sign checks that Caughron or the previous bookkeeper, Kathy Kirker (Kirker), had previously printed and sent to New York for Brach's approval. Upon plaintiff's receipt of the approved checks from Brach, he would merely glance at the pre-approved check to make sure the bill and the amount of the check coincided. The only instance in which plaintiff would hand write checks was when plaintiff went to cattle auctions. In that instance, Brach had given plaintiff the general authority to write checks for cattle without pre-approval; a necessity given the nature of an auction (Doc. 59, Trial Transcript Vol. II, pp. 93-95).[10] Thus, plaintiff did not have the authority to make decisions as to

---

[10] The Court again feels it necessary to reiterate that although Caughron was not employed at Gateway Beef until around June 2004, plaintiff testified that Caughron and Kirker maintained the same duties concerning computation of the tax liability in question and the general procedure for sending checks to New York for Brach's pre-approval.

what bills to pay. Caughron similarly testified that plaintiff had nothing to do with payables.

The government further contends it presented evidence that plaintiff had the authority to refuse to sign checks. Plaintiff testified he did not recall ever refusing to sign a check. He suggested that he probably could have refused, but he was merely speculating (*See* Doc. 59, Trial Transcript Vol. II, pp. 202-203). Thus, the government's trial position, much like its administrative position, rested on plaintiff's check-signing authority. When viewed in context, plaintiff's check-signing authority was merely that; the ability to sign a pre-approved check. Brach clearly did not authorize plaintiff to decide what creditors to pay. As evidenced by the testimony of plaintiff and Caughron, the correspondence of Mark Weiss and Brach, and Boston's affidavit, plaintiff was not authorized to prioritize which creditors should receive payment. *Jefferson*, 546 F.3d at 481. Thus, the government's position at trial that plaintiff was a "responsible person" was not substantially justified. *See Barton v. United States,* 988 F.2d 58, 59 (8th Cir. 1993) (remanding district court's denial of fees under § 7430, as the district court did not even mention that from the onset of the litigation the government had no evidence refuting plaintiff's clear showing that he lacked significant authority in matters related to federal tax payments and further noting, "[a] person's technical authority to sign checks and duty to prepare tax returns are not enough to make the person responsible under § 6672") (citation omitted).

The Court finds the government has not met its burden of demonstrating its position at trial that plaintiff was a "responsible person" was not substantially justified. Thus, it is unnecessary to discuss the government's evidence of his "willfulness." However, the for sake of completeness, the Court also finds the government was not substantially justified in its trial position that plaintiff acted willfully as to the tax liability. As to plaintiff's knowledge, the government argues that as he signed the majority of the payroll checks for the periods in question, he knew the withholding taxes were not being paid, especially in light of the fact plaintiff had previously paid withholding taxes through his ownership of Tarpoff Packing Company. Thus, the government argues it presented evidence of plaintiff's direct knowledge.

Plaintiff signed checks for delinquent withholding taxes in 2004, and IRS transcripts show that delinquent 2003 taxes were paid in 2004. However, plaintiff testified that he had no knowledge as of June 2004 whether Gateway Beef had paid its payroll taxes for the periods in question. Plaintiff stated he developed fears that Brach had not paid the taxes sometime at the end of 2004, but at that time plaintiff was in the employ of a different company (Doc. 59, Trial Transcript Vol. II, p. 121-22). Caughron testified that the IRS notices were sent to her, as she was the bookkeeper and computed the tax liability in question subject to Boston's approval. Caughron would then immediately send them on to Brach. Plaintiff testified that Kirker and Caughron maintained the same duties and responsibilities as Gateway Beef's bookkeepers.  Thus, plaintiff never received

notice of the liability in question. Plaintiff's general awareness of an employee's duty to pay withholding taxes does not equate actual knowledge of Gateway Beef's failure to pay.

As to reckless disregard, the government argues that plaintiff's signing of so many checks, including payroll checks, without ensuring that payroll taxes were being paid, demonstrates that he clearly ought to have known that withholding taxes were not being paid. In support, the government cites plaintiff's general awareness of Gateway Beef's financial difficulties and his ability to find out very easily whether the taxes were being paid. *See Wright*, 809 F.2d at 428.

Plaintiff had check-signing authority and was a signatory on the bank accounts. Thus, his position did not encompass a right to look at the company's books, and it is unclear how easily it would have been for plaintiff to find out whether the taxes were being paid. During the relevant time periods, plaintiff was not aware of Gateway Beef's history of failing to pay withholding taxes and there was little evidence that plaintiff knew the company was losing money. Plaintiff was aware of only one check's return and in the beginning of his employ projected that the company may lose money for a period of time. Thus, the government's position that plaintiff recklessly disregarded a known risk that trust fund taxes were not being paid was not substantially justified.

Finally, the government contends it presented evidence of plaintiff's willfulness, as he used "unencumbered funds" to pay creditors other than the United States.  If a responsible person learns that withholding taxes were not paid

in past quarters when he was also responsible, he is under a duty to use all unencumbered funds available to the corporation to pay the taxes. *Kim*, 111 F.3d at 1157 (citing *Garsky v. United States*, 600 F.2d 86, 91 (7th Cir. 1979)). However, this case was not about unencumbered funds, as plaintiff did not learn about the unpaid taxes until after Gateway Beef had closed and he had left.

Thus, the government has not met its burden of demonstrating that its judicial position was substantially justified. From the onset of the instant judicial proceedings, the government possessed ample, credible evidence of plaintiff's inability to control the finances of Gateway Beef. *See Sharp v. United States*, 145 F.3d 994, 996 (8th Cir. 1998) (holding that the government's position was not substantially justified because "[n]ot only [was] it clear that [the taxpayer] did not have authority to pay the withholding taxes, it [was] also clear from the record that the government was aware of the limitations on [the taxpayer's] authority before it filed its counterclaim"). Further, the evidence presented at trial merely supported plaintiff's repeated contentions concerning his lack of authority. Thus, the government has not demonstrated that its position at any stage of the underlying judicial proceeding was substantially justified.

**C. Proper Amount of Award Under 26 U.S.C. § 7430**

As the Court has determined that neither the government's administrative nor its judicial position was substantially justified, it must now determine the proper amount to award plaintiff pursuant to Section 7430. Plaintiff seeks attorney's fees and costs in the amount of $51,526.67; reflecting fees above

Section 7430's statutory, incurred from March 21, 2007 through June 7, 2011. Alternatively plaintiff seeks an award of $23,756.97, should the Court find "special factors" do not exist warranting an award above the statutory rate.

An award under Section 7430 may include both, "(1) reasonable administrative costs incurred in connection with such administrative proceeding within the Internal Revenue Service, and (2) reasonable litigation costs incurred in connection with such court proceeding."  26 U.S.C. § 7430(a).  However, Section 7430 substantially limits the amount of administrative costs recoverable to include "only costs incurred on or after" the earlier of:

> (i) the date of the receipt by the taxpayer of the notice of the decision of the Internal Revenue Service Office of Appeals; (ii) the date of the notice of deficiency; or (iii) the date on which the first letter of proposed deficiency which allows the taxpayer an opportunity for administrative review in the Internal Revenue Service Office of Appeals is sent.

26 U.S.C. § 7430(c)(2)(B).  Further, litigation costs may not be recovered as administrative costs "because they are not incurred in connection with an administrative proceeding." TREAS. REG. § 301.7430-4(c)(3).  Litigation costs include only "[c]osts incurred after the . . . commencement of any . . . court proceeding." TREAS. REG. § 301.7430-4(c)(3)(ii), (c)(4) Ex. 2.  Thus, as plaintiff received notice of the IRS's decision to deny his appeal on November 12, 2007, he may only receive an award of costs and fees incurred as of this date forward.

As to the amount of attorney's fees recoverable, Section 7430 holds, "such fees shall not be in excess of $125 per hour unless the court determines that a special factor, such as the limited availability of qualified attorneys for such

proceeding, the difficulty of the issues presented in the case, or the local availability of tax expertise, justifies such a higher rate."   However, the rate of $125 per hour, "shall be increased by an amount equal to such dollar amount multiplied by the costs-of-living adjustment [COLA] determined under section 1(f)(3) for such calendar year, by substituting 'calendar year 1995' for 'calendar year 1992' in subparagraph (B) thereof."  26 U.S.C. § 7430(c)(1)(B)(iii).

Plaintiff argues that special factors warrant an award above the statutory cap, as plaintiff's undersigned counsel previously represented plaintiff in a similar matter where a creditor of Gateway Beef unsuccessfully attempted recovery against him. Plaintiff states the creditor voluntarily ceased its attempts at recovery, as it determined plaintiff was not the party responsible for the debt. Thus, plaintiff states his counsel acquired specialized knowledge of Gateway Beef and the meat packing industry in general which entitle him to reimbursement above the statutory rate. The Court finds plaintiff's counsel's previously-developed familiarity with plaintiff and his business do not qualify as the type of special factor contemplated under Section 7430. Thus, plaintiff's recovery is limited to the statutory rate.

Pursuant to § 7430(c)(1)(B)(iii), the IRS annually applies the COLA required of the base hourly rate, and publishes the calendar-year hourly attorneys' fee rate in a revenue procedure. The allowable rates for legal fees incurred in 2007, 2008, 2009, 2010, and 2011 are as follows:

| Year | Allowable Fee | Revenue Procedure |
|------|---------------|-------------------|
| 2007 | $ 170 per hour | Rev. Proc. 2006-53, 2006-48 I.R.B. 996 |

| | | | |
|---|---|---|---|
| 2008 | $ 170 per hour | Rev. Proc. 2007-66, 2007-45 I.R.B. 970 |
| 2009 | $ 180 per hour | Rev. Proc. 2008-66, 2008-45 I.R.B.1107 |
| 2010 | $ 180 per hour | Rev. Proc. 2009-50, 2009-45 I.R.B. 617 |
| 2011 | $ 180 per hour | Rev. Proc. 2010-40, 2010-46 I.R.B. 663 |

*See id.* Plaintiff has provided the Court with invoices and summaries of his requested fees (Doc. 55-1, 55-2; Doc. 83-9, 83-10). Upon careful review of the documentation provided, the Court finds the fees and costs plaintiff seeks from November 12, 2011 through March 25, 2011 are reasonable.[11] Thus, the Court awards plaintiff attorney's fees in the amount of $14,389.00 and costs in the amount of $2,712.36; a total award of $17,101.36.

## V.   CONCLUSION

For the above stated reasons, the Court **GRANTS in part** plaintiff's motion to award fees and costs (Docs. 55, 83). Thus, the Court awards plaintiff fees and costs in the amount of $17,101.36.

**IT IS SO ORDERED.**

Signed this 19th day of June, 2012.

Digitally signed by David R. Herndon
Date: 2012.06.19 15:15:23 -05'00'

**Chief Judge**
**United States District Judge**

---

[11] The Court notes that plaintiff's supplemented motion additionally seeks attorney's fees incurred from April 8, 2011 through June 7, 2011 (Doc. 83-10). However, plaintiff has not provided documentation of such fees. Thus, as the Court cannot determine whether such fees are reasonable, it cannot include the requested fees in its award.